1  Alejandro P. Gutierrez, SBN 107688
2  **LAW OFFICES OF HATHAWAY, PERRETT, WEBSTER, POWERS, CHRISMAN & GUTIERREZ, APC**
3  200 Hathaway Building
   5450 Telegraph Road
   Post Office Box 3577
4  Ventura, CA  93006-3577
5  Telephone:(805) 644-7111
   Facsimile: (805) 644-8296
6  E-mail:  agutierrez@hathawaylawfirm.com

7  Daniel J. Palay, SBN 159348
   Michael A. Strauss, SBN 246718
8  Brian D. Hefelfinger, SBN 253054
   **STRAUSS & PALAY, APC**
9  121 N. Fir Street, Suite F
   Ventura, CA  93001
10 Telephone: (805) 641-6600
   Facsimile: (805) 641-6607
11 E-mail:  djp@palaylaw.com

12 Attorneys for Plaintiffs and the Certified Class

13 ## UNITED STATES DISTRICT COURT

14 ## NORTHERN DISTRICT OF CALIFORNIA

15 MATHEW ROSS, an individual; for himself and those similarly situated;
16 ROBERT MAGEE, an individual, for himself and those similarly situated and
17 ROES 1 through 30,000; and the Certified Class,
18
19           Plaintiffs,
20
21     vs.
22
23 ECOLAB, INC., a Delaware Corporation; and DOES 1 through 100, inclusive,
24
25           Defendants.
26
27
28

CASE NO:  C 13-05097 PJH

Action filed December 21, 2009

**CLASS ACTION**

**DECLARATION OF ALEJANDRO P. GUTIERREZ IN SUPPORT OF PLAINTIFFS' *UNOPPOSED* MOTION FOR FINAL APPROVAL OF CLASS COUNSEL ATTORNEY FEES AND COSTS**

**Hearing:**
**Date:**          **August 31, 2016**
**Time:**          9:00 a.m.
**Courtroom.:**   3, 3rd Floor

1

1

2

## DECLARATION

3

I, Alejandro P. Gutierrez, declare as follows:

4

1.      I am an attorney at law qualified to practice before the state and federal courts in

5

California.  I am a partner with the law firm of Hathaway, Perrett, Webster, Powers, Chrisman &

6

Gutierrez, APC, attorneys of record for Plaintiffs and Class Counsel for the certified class in the above-

7

entitled action.  I am the attorney at our firm responsible for the litigation of this class action.  I have

8

personal knowledge of the facts stated in this declaration and if called upon, I would and could testify

9

competently thereto.  I make this declaration in support of Plaintiffs' Motion for Final Approval of

10

Attorney's Fees and Costs.  The factual representations found in the contemporaneously filed Motion

11

for Final Approval of Class Action Settlement and Declaration of Alejandro P. Gutierrez in Support of

12

13

Motion for Final Approval of Class Action Settlement are, to the best of my knowledge, true and correct.

14

2.      Seven years ago, James Icard, a route manager for Ecolab who serviced and maintained

15

commercial dishwashers leased by Ecolab customers, came to my co-counsel, Dan Palay (who then

16

contacted me) prepared to take on his employer Ecolab Inc., a Fortune 500 company and the world's

17

leading provider of "health protection products" with $13.5 billion in reported net sales (2015), because

18

19

it had refused to pay James premium wages for weekend and other overtime work.  He agreed to bring

20

the wage action not only for himself but for the benefit of a class of workers who, like James, worked

21

long hours and weekends for Ecolab without overtime pay or meal breaks.  James subsequently filed a

22

class action against Ecolab on behalf of Route Sales Managers in California.  Later, Matthew Ross and

23

Robert Magee were substituted in as class representatives.

24

### COUNSEL'S EFFORTS ON BEHALF OF THE CLASS

25

3.      This litigation has been complex and demanding, requiring the resources of two law

26

firms to perform the tasks required, as set forth in the concurrently filed declarations of Daniel Palay,

27

28

Michael Strauss, and Brian Hefelfinger.   It is notable that Ecolab was represented in this litigation by

1  two major law firms, Littler Mendelson and Stokes Wagner Hunt Maretz & Terrell.  Littler Mendelson

2  advertises itself as the largest U.S.-based law firm exclusively devoted to representing management in

3  employment matters with more than 70 U.S. and global offices.  A third law firm, Wilson Elser

4  Moskowitz Edelman & Dicker, LLP, also represented Ecolab earlier in the case.

5        4.      I and other Class Counsel made every effort to litigate this case efficiently by

6  apportioning tasks to reduce duplication of effort, while communicating regularly about strategy and

7  tactics.  For instance, thirty-eight depositions were taken in this matter, which were split among me and

8  three attorneys at the Strauss & Palay firm.  I attended twenty-two of the depositions, including eight

9  depositions involving Ecolab's designated corporate witnesses and three depositions involving Ecolab's

10  "expert," Donald Winter.  We also split attendance at hearings when practical.  I attended the hearings

11  on the Plaintiffs' certification motion and a number of hearings on the parties' dispositive motions, both

12  in state and federal court.  As lead attorney, I was involved in settlement discussions and strategy and

13  in working with our statistical expert.  In relation to the briefing tasks allocated to my firm, I spent many

14  hours researching legal issues regarding the three exemptions that Ecolab was asserting, including the

15  "hazmat" exemption. We split tasks associated with settlement and mediation matters.  I prepared for

16  and attended two of the three mediations- including the final mediation which resulted in a settlement-

17  that took place in this matter. The Strauss & Palay firm prepared damages models relating to our

18  settlement efforts. I made every effort to reduce attorney's fees by assigning work to the lowest billing

19  timekeepers where feasible.  For example, I worked with a certified paralegal to perform drafting of law

20  and motion briefs and other legal briefing, drafting of discovery and responses to discovery,

21  summarizing deposition transcripts, preparing issue schedules, maintaining evidence databases, and

22  preparing spreadsheets of sample SDRs and sample commissions for several class members, among

23  other tasks.  I assigned another certified paralegal and an associate attorney to assist in going through

24  the mountains of Service Detail Reports, commission statements, ESM time data and other

25  documentation provided by Ecolab and to index the same.

26

27

28

3

5.    As described in detail below, and in the declarations of Daniel Palay, Michael Strauss, and Brian Hefelfinger, both law firms have carefully reviewed its time records and exercised billing judgment to delete entries that arguably represent duplicative or excessive time.

### PRE-FILING INVESTIGATION, COMPLAINT

6.    Class Counsel for the Plaintiffs in this matter were also Class Counsel for the plaintiffs in the *Roe v. Ecolab* and *Dietz v. Ecolab* cases, which involved wage and hour claims brought by classes of Ecolab's pest elimination specialists. In 2009, shortly after Ecolab satisfied the judgment against it in the consolidated *Roe/Dietz v. Ecolab* class action cases, Icard contacted my co-counsel, Dan Palay regarding the same type of violations of California wage laws alleged in the *Roe/Dietz* consolidated cases.  Prior to filing the complaint in this matter, we conducted a thorough investigation, including interviewing several Route Managers (the title was later changed by Ecolab to Route Sales Managers) who worked for Ecolab in different locations throughout California.  Many of these individuals later submitted written declarations in support of Plaintiffs' Motion for Class Certification.  Based on this investigation, we then drafted the complaint alleging class-wide violations of the Labor Code and IWC Wage Orders.

### ECOLAB'S THREE REMOVALS OF STATE-FILED CASE

7.    Shortly after Mr. Icard's class-action complaint was filed on December 21, 2009, Ecolab attempted to remove the case to federal court based on diversity and the amount in controversy. In short order, Ecolab filed a motion to dismiss based on the purported effect of a pending settlement in another class action involving Ecolab Route Managers, *Clark et al. v. Ecolab Inc.*, No. 07-CIV-8623 (S.D.N.Y.).  We were tasked with addressing Ecolab's Motion to Dismiss as well as filing a Motion to Remand, a Motion for Sanctions for improper removal, and an amended Complaint against Ecolab. Correspondence between Class Counsel and Ecolab's attorneys was exchanged regarding the removal. Remand was granted on June 18, 2010.  Ecolab's tactics set the case back several months.

8.    So, too, did Ecolab's Answer to Complaint, which it finally filed seven months after the

original complaint was filed, in which it asserted thirty-seven boilerplate "affirmative defenses." Such necessitated Plaintiffs to prepare and file a demurrer to Ecolab's answer, which was sustained with leave to amend. By the time Ecolab filed its amended Answer to Complaint in response to Plaintiffs' demurrer on August 27, 2010, the case had been set back eight months.

9.      Shortly after Plaintiffs filed their First Amended Complaint, Ecolab removed the case a second time in June 2011, Plaintiffs opposed, and the federal court remanded it again in September 2011. Another three months were lost while the motion for removal was pending.

10.     Finally, Ecolab removed the case for the third time in October 2013. This time, Plaintiffs did not oppose and the case proceeded in federal court.

## WRITTEN DISCOVERY

11.     Plaintiffs propounded eight sets of requests for production of documents. In response to those requests, Ecolab produced hundreds of thousands of documents, totaling over a million pages. Ecolab's production included Service Detail Reports, including Routine Maintenance Reports and Extra Service Reports, commission statements, earnings statements, check details, performance track reports, annual review forms, 360 opportunity reports, coaching plans, ESM-time records, territory rankings reports, training modules, hand-outs and manuals, training transcript reports, compensation plans, personnel files, Ecolab ware washing lease program materials, product promotional material, various sample lease agreements, material safety data sheets, chemical labels and other relevant documents. The detailed review of these documents was essential to our investigation of this case. We used many of the more significant documents obtained as exhibits to Plaintiffs' motions for class certification.

12.     Also, we spent dozens of hours reviewing, indexing, and analyzing this documentation in order to prepare Plaintiffs' dispositive motions regarding the exemptions asserted by Ecolab. For instance, among other things, my staff and I compiled six months of commission data related to selected class members, including the twelve individuals whose declarations Ecolab submitted with its summary judgment motion. We prepared spreadsheets of the total direct and indirect commissions and

percentages of sales not related to any sales effort by the route manager.  We also prepared a schedule of average percentages of commissions earned through the sales by distributors.  Based on our analyses, we were able to prove that class members were not subject to the commissioned sales exemption.  Further, my staff and I went through tens of thousands of Service Detail Reports for multiple class members, including those for the 12 individuals whose declarations Ecolab submitted with its motion for summary judgment.  From those SDRs we compiled "day in the life" spreadsheets of the tasks performed by the route managers, the times spent at each customer location, and the average hours worked per day.  Based on our analysis of the SDRs, we were able to prove that class members were performing primarily hands-on work and therefore not subject to the outside sales exemption.  Our review of the million plus pages of documents also informed us of the lack of any evidence to support Ecolab's assertion that RSMs were commercial drivers subject to the "haz/mat" exemption.

13.     In reviewing the documentation, we attempted to be as efficient as possible, given the magnitude of the task.  The documents were produced in various forms, including hard copy, electronic and hard drive.  In most cases, the documents were reviewed electronically, thus saving hundreds of thousands of dollars in copying and printing costs.

14.     We also propounded five sets of special interrogatories, four sets of form interrogatories, and eight sets of requests for admission, and reviewed Ecolab's responses to these discovery requests.  The detailed interrogatories were necessary for ascertaining fundamental class information, as well as invalidating the three exemptions asserted by Ecolab.  We needed to be completed versed in the legal elements of each exemption to tailor our interrogatories to the issues at hand. For instance, we needed to understand the "Materials of Trade" exception to transporting household goods containing materials on the Hazardous Materials Table in order to ask questions directed at the hazmat exemption issue.  We needed to understand the legal definition of commercial vehicle, commercial driver, and hazardous substance for the same reason.   In formatting our interrogatories to get crucial information regarding the exemptions asserted, we were able to deconstruct

Ecolab's defenses and ultimately prevail at the final summary judgment phase of the litigation. We spent countless hours working with the named Plaintiffs to respond to Ecolab's discovery requests. We also spent substantial time preparing and finalizing Plaintiffs' Rule 26 disclosures.

15.     Right from the beginning, Ecolab made the discovery process difficult by refusing to fully respond to Plaintiffs' discovery requests. For instance, in connection with the first sets of written discovery, we prepared extensive meet and confer correspondence when Ecolab refused to provide pertinent information regarding the putative class. Following Ecolab's refusal to supplement its responses to the first sets of special interrogatories and production of documents, we were obliged to prepare a motion to compel and for sanctions against Ecolab, along with the requisite separate statement and supporting declarations, which Ecolab vigorously opposed. The motion was ultimately granted and Ecolab was ordered to pay sanctions to Plaintiffs. Although Ecolab paid the sanctions and answered the discovery, in February 2011, it filed a motion for reconsideration of the court's order to "correct the record." Such required us to spend hours preparing an opposition. Even after the court's order compelling Ecolab to provide further responses, we were required to spend hours of additional time meeting and conferring with Ecolab's attorneys in regard to Ecolab's failure to comply with the court's order. Further, when Ecolab failed to identify documents it referred to in its discovery responses, additional meet and confer telephone conferences were necessitated. In fact, we were still petitioning this Court for further responses to discovery requests as late as January 2015 and asking for sanctions against Ecolab, which request was granted.

## DEPOSITIONS

16.     We further investigated the claims in this action by deposing Ecolab's designated corporate witnesses on topics ranging from the number of putative class members, Ecolab's meal period policy, the position titles for route manager position and the reason for the change in title, the hours worked by Plaintiffs, Ecolab's practices in regard to record-keeping of hours, what portions of the hours worked by Plaintiffs were recorded on Ecolab's SDRs, Ecolab's overtime pay policy, duties and

responsibilities of RSMs, the percentage of time spent by RSMs in their various duties, how sales commissions were earned, including commissions earned by RSMs on machine rental fees, the contents of commission statements, how RSMs were compensated, whether Ecolab limited the RSMs' hours of service, and the contents of all written lease agreements, among other things.  In all, we deposed seven Ecolab corporate witnesses, one of them twice.  For one of the corporate witness depositions, I had to travel to San Francisco, for another to San Diego. The other depositions were arranged by videoconference, as many of Ecolab's corporate witnesses were located in Minnesota.  This required extensive planning and efforts by my staff to arrange the depositions. In addition to Rule 30(b)(6) witnesses and persons most knowledgeable, I attended three depositions of Ecolab's expert regarding RSMs' duties, Donald Winter.  In addition, we took the depositions of three of Ecolab's declarant employees, one in Burbank and two in San Francisco.

17.     Ecolab took 22 depositions of class members, including those of James Icard and the two named Plaintiffs who substituted as class representatives, Matthew Ross and Robert Magee, and a sampling of other Route Managers in a range of locations, including Los Angeles, Sacramento, San Luis Obispo, San Francisco, Palm Desert, Irvine, and Corona.  My co-counsel and I defended these depositions, necessitating substantial travel.

18.     My staff and I reviewed and summarized the thirty-eight deposition transcripts for evidence of Ecolab's practices and procedures, evidence of the route managers' actual day-to-day tasks, their average hours worked per day and per week, their average hours worked during mandatory weekend duty, their average hours worked at home before and after work in the field, their practices in keeping Service Detail Reports, and the materials they transported in their vehicles, among many other things.  We kept issues databases cross-referencing testimony that we referred to constantly. This work was crucial in proving that route managers were working primarily rendering hands-on service, not selling products, and thus not subject to the outside salesperson exemption; that most of the products sold were reorders or sold by distributors and thus that the RSMs were not subject to the commissioned

8

sales exemption; and that Ecolab never limited the hours of duty of the RSMs or required them to have commercial driver's licenses or hazmat training, did not keep records of the chemicals they transported in their company vehicles and thus that they were not subject to the hazmat exemption.

## WITNESS INTERVIEWS AND DECLARATIONS

19.    After Ecolab was compelled to produce the last known contact information for the over 200 class members, we mailed letters to all of these individuals, advising them about the pending lawsuit and requesting that they contact Class Counsel if they wanted to provide information to assist in the litigation.  As a result of this letter, my co-counsel and I interviewed and gathered information relevant to class certification, liability and damages issues in the lawsuit from dozens of putative class members who contacted us.  For instance, we interviewed dozens of Class Members regarding their day-to-day duties at Ecolab, the amount of overtime hours they worked, the amount of weekend duty they worked, the contents of their paystubs, the materials they carried on their Ecolab vehicles and the quantities of such materials, whether they kept log books (none did), whether they had a commercial driver's license (none did), whether they were hired as "drivers" (none were), and whether they had "haz/mat" training (none did).  We ultimately collected dozens of signed declarations from class members.

20.    In addition, my co-counsel and I kept in constant contact with a number of those individuals throughout the course of this action regarding additional facts they could provide relative to Ecolab's claimed exemptions.  A large number of Class Members in this action were particularly pro-active and interested in all aspects of the litigation and we were constantly fielding inquiries from those individuals as to the status of the case.  We relied on our interviews with class members to provide us with the facts we needed to support Plaintiffs' successful motion for class certification and successful summary judgment motions relating to the three exemptions asserted by Ecolab.

## WRITTEN COMMUNICATIONS

21.    Further, once the class was certified, we mailed to all putative class members case status communications.

9

### EXPERT

22.     In response to discovery, Ecolab produced electronic data concerning over 233 employees, including, as discussed earnings statements, SDR data, commissions statements, and ESM time records.   We retained Dr. Richard Drogin, an experienced statistician, in preparation for the eventual trial of this case to be Plaintiffs' statistical sampling expert.   My co-counsel and I thoroughly discussed the damages issues with Dr. Drogin and culled pertinent documents from the million plus pages of documents to submit to Dr. Drogin to review in preparation for his role as expert witness.

### AMENDED COMPLAINTS

23.     After Ecolab removed this matter to federal court for the first time, Plaintiffs filed a corresponding First Amended Complaint in that jurisdiction in March 2010.   In June, 2011, after the case had been remanded to state court, Plaintiffs filed a Second Amended Complaint that added to the class allegations a class period beginning in December 2005.   In all other regards, the complaint was largely the same. In April 2014, Plaintiffs amended their original complaint for the third time.   Plaintiffs' Third Amended Complaint added a PAGA cause of action pursuant to *Labor Code* § 2699 et seq. seeking civil penalties for violations of the *Labor Code*, including sections 210, 226.3, 558, and 2699(f).

### MOTIONS

24.     In addition to the motion to compel further discovery described above, we also were forced to file other discovery motions, including in May 2012, a motion to quash subpoenas after Ecolab served us with six subpoenas for the depositions of putative class members unrealistically set in four different cities spanning the state of California during a period of four days.   Ecolab had refused meet and confer efforts to cancel the subpoenas.   Ecolab opposed the motion and filed its own motion requesting sanctions of over $5,000 against Class Counsel for telling the deponents the depositions would not be going forward, even after Ecolab's attorneys told them the same thing.   Ecolab eventually took the sanctions motion off calendar, but not before we spent hours preparing an opposition to

DECLARATION OF ALEJANDRO P. GUTIERREZ IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEY FEES – C 13-05097 PJH

1    Ecolab's retaliatory motion.  The parties' counsel ultimately stipulated to a compromised deposition

2    schedule and Plaintiffs' motion to quash was also taken off calendar.

3         25.     We engaged in extensive substantive motion practice, in addition to the discovery

4    motions described above.  As mentioned, Ecolab removed the case three times, requiring us to prepare

5    Motions for Remand for the first two removals, which were granted.  Ecolab also filed two separate

6    Motions to Dismiss in federal court, which required us to prepare memorandums in opposition to such

7    motions, as well supporting declarations and appendices.

8         26.     We filed Plaintiffs' motion for class certification in state court on February 12, 2012.

9    The motion was supported by voluminous evidence, including sixteen declarations by putative class

10   members, deposition testimony of Ecolab's corporate witnesses, earnings statements, Ecolab employee

11   manuals, Ecolab ESM Time procedures, meal break tracking forms, and ESM Time entries.  After we

12   filed the motion to certify the class, Ecolab requested a continuance of the hearing on the motion pending

13   the *Brinker v. Superior Court* decision concerning an employer's duty to provide meal periods.  The

14   court granted Ecolab's request and continued the hearing on Plaintiffs' motion to certify the class from

15   March 15, 2012 to April 30, 2012.  The *Brinker* decision was published on April 12, 2012 and on April

16   16, 2012 Ecolab filed its opposition to Plaintiff's motion to certify the class.  By the time Plaintiffs filed

17   their reply in support of their motion for class certification, the court in *Ladore v. Ecolab,* a class action

18   litigated by the same Class Counsel involving Ecolab pest elimination specialists, had issued its decision

19   on Plaintiffs' motion for class certification, in which it essentially stripped Ecolab of the "haz/mat

20   exemption" defense and Plaintiffs included Judge Feess' analysis of the same in their reply.  Plaintiffs'

21   certification motion in the present case was granted at the hearing on May 25, 2012.

22        27.     On May 24, 2012, one day prior to the hearing on Plaintiffs' motion for Class

23   certification, Ecolab filed a motion for summary judgment with supporting separate statement,

24   declarations, request for judicial notice, and lodgment of hundreds of pages of exhibits.  A week later,

25   on June 1, 2012, Ecolab filed a motion for summary judgment of class claims or in the alternative motion

11

for summary adjudication of issues. We spent many hours drafting an opposition to Ecolab's motion for summary judgment and supporting documents, including evidentiary objections. On August 10, 2012, without providing any explanation whatsoever for doing so, Ecolab withdrew its motion for summary judgment and simultaneously filed a motion to designate action complex. We prepared an opposition to the motion to designate complex with supporting documents. Ecolab's motion was denied on October 2, 2012.

28.    Ecolab filed its second Motion for Summary Judgment on January 24, 2013 with various supporting documents related to the three overtime exemptions it asserted. Once again, we spent hours and hours drafting an opposition and supporting documents in response to Ecolab's new motion. Ecolab's motion was ultimately denied in September, 2013. In addition, we filed Plaintiffs' own motion for summary adjudication related to the motor carrier, or "hazmat" exemption, which was filed on January 24, 2013. We spent many hours conducting painstaking research related to the legislative history, both state and federal, of the haz-mat exemption to overtime laws.

29.    At the June 6, 2013 hearing on the cross-motions for summary judgment, the superior court took issue with the fact that Plaintiffs' motion did not "completely dispose" of an affirmative defense because in Ecolab's Answer to Second Amended Complaint, it impermissibly combined its "haz-mat" defense with numerous exemptions from entitlement to overtime pay. Accordingly, pursuant to the court's concerns, we prepared a Motion for Judgment on the Pleadings for an order compelling Ecolab to amend its answer or in the alternative to strike its Fifth Affirmative Defense. Ecolab opposed the motion notwithstanding the court's directive. Plaintiffs' motion for judgment was granted in August 2013 and Ecolab was given leave to amend its answer. One day following the court's ruling, Plaintiffs re-filed their motion for summary adjudication regarding the "haz-mat" exemption defense. The court's decision on Plaintiffs' motion was pending when Ecolab removed the case for the third time in November 2013.

30.    Meanwhile, in March 2013, Ecolab filed a motion to decertify the class, which required

that we spend many hours drafting an opposition with supporting documents.  Ecolab filed an amended summary judgment motion and amended motion to decertify the class in May 2013.  Both were denied.

31.     In April 2013, we filed an ex parte application for an order re trial management plan using random sampling methodology supported by the declaration of Dr. Drogin and Ecolab opposed it on the basis of purported due process rights, citing to *Wal-Mart v. Dukes*.  We analyzed and distinguished *Dukes* and cases interpreting it to effectively reply to Ecolab's arguments.  The motion became moot when Ecolab removed the case to federal court for the third and final time.

32.     In July, 2013, we prepared a motion for order substituting class representatives after the superior court found original named plaintiff James Icard to be an inappropriate class representative. Instead of stipulating to the two substitute representatives, as its counsel had agreed to in open court, Ecolab vigorously opposed the motion.  Such refusal to stipulate and vigorous opposition required that we spend many hours preparing the motion and supporting reply.  Plaintiffs' motion was granted.

33.     After the case was removed to federal court for the final time, we filed a leave to amend complaint to add the PAGA cause of action, which motion was granted.  In its answer to Third Amended Complaint, Ecolab this time asserted twenty-seven affirmative defenses.  We filed a motion to strike many of Ecolab's boilerplate affirmative defenses, which Ecolab vigorously opposed. Plaintiffs' motion was granted in part and Ecolab amended its answer in August 2014.  In October, 2014, the Court entered an order requiring Ecolab to supplement its discovery responses to prior written discovery in the case (including discovery during the state court proceedings) relative to certain omitted individuals.  When Ecolab did not comply with the court's order, we filed a motion for contempt and sanctions, which was granted, and the Court allowed Plaintiffs additional time to file their dispositive motion.

34.     We spent extensive amounts of time preparing a motion for partial summary judgment and supporting documents related to the three exemptions asserted by Ecolab, including 88 exhibits, this time applying federal rules of civil procedure.  We referred extensively in Plaintiffs' motion to the *Ladore* court's January 22, 2013 order granting plaintiffs' summary judgment motion, in which it again

13

rejected Ecolab's haz-mat exemption defense. In its opposition to Plaintiffs' motion in this case, Ecolab argued that Plaintiffs' counsel had misled the *Ladore* court, that Judge Feess was victimized by counsel's purported misstatements, and that Judge Feess' ruling was "egregiously wrong."  This Court did not agree.

35.     We also kept close watch on a New York case involving Ecolab RSMs, *Charlot v. Ecolab,* and read depositions taken in that case, including the deposition of Ecolab's expert in this case, Donald Winter.  We became familiar with the filings and rulings in *Charlot* by checking the docket on a constant basis and keeping in touch with plaintiffs' counsel in that case.  We became aware through our vigilance, for example, that the *Charlot* court had stricken the Winter declaration in support of Ecolab's motion for summary judgment in the *Charlot* case.  We compared facts in this case with the *Charlot, Clark,* and *Masson* cases, all involving Ecolab RSMs.

36.     We spent extensive amounts of time responding to Ecolab's Opposition to Plaintiffs' motion for partial summary judgment, as well as to Ecolab's counter-motion for summary judgment and motion for decertification of the class. Much time was spent on evidentiary objections related to the declarations of numerous undisclosed witnesses, including the lay opinions of individuals purporting to interpret state regulations regarding the motor carrier exemption (Robert Jones), hazardous materials regulations (Michelle Gardner and Frits Wybenga) and purporting to offer legal conclusions regarding the outside sales exemption (Donald Winter).  Also, we spent much time reviewing deposition testimony cited by Ecolab in its motions and comparing such testimony to the complete transcripts to give the testimony context in order to offer argument rebutting Ecolab's spin on the evidence.

37.     As stated, we conducted extensive legal research regarding the three exemptions asserted by Ecolab. Based on the research we had conducted over the six plus years of litigation, we were well-versed in the federal and state versions of the motor carrier exemption and the exemption's legislative history. Based on such lengthy research and informed by previous courts' desire for step-by-step guidance from counsel as to the motor carrier exemption regulations, my staff and I prepared a

comprehensive Power Point presentation of all applicable regulations, authorities and interpretive bulletins, to be used if necessary to demonstrate to this Court the purpose of the exemption and why it only applies to commercial drivers. When it became clear at the hearing on the parties' cross-motions that the Court was itself well-versed in all aspects of the asserted motor carrier exemption, I opted not to use the Power Point presentation we had laboriously prepared. In September 2015, this Court granted Plaintiffs' motion for partial summary judgment as to the three exemptions asserted by Ecolab and denied Ecolab's cross-motion for summary judgment regarding the same. The court also denied Ecolab's motion for class decertification.

38.     However, that was not the end of the Ecolab's vigorous contest relating to its exemption defenses. Ecolab filed a Motion for Leave to Appeal the court's order granting Plaintiffs' motion for partial summary judgment on October 28, 2015. We spent many hours responding to Ecolab's ill-conceived and last-ditch motion, which motion was eventually stayed pending the parties' final mediation.

39.     Ecolab's aggressive defense tactics throughout this litigation left us with no choice but to respond in kind; prosecuting this case required an extraordinary commitment of time, resources, and energy from us and the relief achieved simply would not have been possible but for our commitment and skill.

### SETTLEMENT NEGOTIATIONS

40.     The mediation process that eventually led to the Settlement Agreement was lengthy and contentious. The parties discussed settlement over the course of several years, beginning with a confidential settlement communication sent by Class Counsel to Ecolab's attorney in 2010. In such letter, we suggested that the parties participate in private mediation and set forth models of Ecolab's potential liability for each claim asserted by Plaintiffs. Ecolab was not interested in mediating at that time.

41.     In January 2014, this court ordered the parties to participate in private mediation. In

**DECLARATION OF ALEJANDRO P. GUTIERREZ IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEY FEES – C 13-05097 PJH**

March 2014, and then in June 2014, Ecolab filed a motion to continue the mediation completion date. Finally, a mediation was held on August 8, 2014 with mediator Michael J. Loeb. We spent much time preparing a mediation brief and exhibits for the mediator, calculating and preparing damages models, preparing for the mediation, and attending the mediation. The parties were unable to reach a settlement at that mediation, as the gap between the parties' valuation of the case could not be bridged – Ecolab's "nuisance value" was far from Plaintiffs' hard settlement number based on well-researched, fully credible damages models.

42.     The parties agreed to participate in a second mediation with Mr. Loeb on April 16, 2015. Once again, we prepared a new mediation brief and exhibits, calculated damages to date and prepared new damages models, prepared for the mediation and attended the mediation. The parties were again unable to reach a settlement, Ecolab insisting that it would not put serious money on the table until the court had ruled on its pending motions for summary judgment and for decertification.

43.     Finally, after those motions did not turn out in favor of Ecolab, the parties participated in a third mediation on February 12, 2016 with mediator Hunter R. Hughes. Once again, for the final mediation we prepared a new mediation brief focusing the issues as of that time, including the fact that after the ruling on the parties' dispositive motions Ecolab had no defenses to liability, calculated the damages as of that time and prepared new damages models. This time, the parties were able to reach a class-wide settlement that has been preliminarily approved and is the subject of the final approval process.

44.     Under the Settlement, Ecolab has agreed to pay an all-in total of $35 million (plus employer-side taxes), the equivalent of 15 overtime hours per week to the class members for the claims period plus all legal interest on these amounts owed (after fees). With 213 class members, this represented a *per capita* recovery of $164,319.24 before deduction of fees, litigation expenses, administration costs and incentive awards. The average net payment (measured by dividing amongst the class members the Net Settlement Amount after payment of expenses, administration costs and fees)

was in excess of $100,000 to each class member. The actual result after completion of the Class Notice and claims period is an average payment per Participating Class Member of over $109,000, with the highest payment estimated at $264,383.89. See Cunningham Decl. ISO Motion for Final Approval of Class Action Settlement, ¶ 15. This is one of the highest (if not the highest) *per capita* wage/hour settlement recoveries ever achieved in California.

45.  Thereafter, my co-counsel drafted the Motion for Preliminary Approval of Class Settlement and all supporting documents, including Class Notice and the proposed order.

46.  Additionally, my staff and I drafted the Motion for Final Approval of Class Settlement and supporting documents, as well as the separate Motion for Final Approval of Attorney's Fees and Motion for Final Approval of Incentive Awards.

## SETTLEMENT PERCIPITATES SIGNIFICANT POLICY CHANGE

47.  On April 11, 2016, I received from one of my clients an e-mail update from Dave Scarsella, Sr. Vice President, Institutional Field Sales for Ecolab Inc. directed to "All Ecolab Institutional Route Sales Managers and Pureforce Sales Service Route Managers in California." In such e-mail, class members were apprised that due to the Court's ruling in this litigation that class members are overtime eligible under California state law, Ecolab was changing its compensation model "so that Institutional RSMs and Pureforce SSRMs in California will be eligible for overtime." Attached hereto as Exhibit A and incorporated herein by reference is a true and correct copy of the e-mail communication I received from my client.

## CLASS COUNSEL OVERCAME A SERIES OF SIGNIFICANT RISKS

48.  This was not an easy case.  To achieve the Settlement for the class, we took on and overcame a series of very significant risks.  As an initial matter, the defendant here mounted a particularly aggressive defense over the course of over six years; each step of this case has been marked by heavily contentious litigation. As mentioned, Ecolab was represented by experienced and well-resourced defense firms, who vehemently contested liability. (See ¶ 3 herein).

17

49.     Further, there were several pending cases that could have significantly impacted this case. For instance, there was a pending case in the Central District, *Ladore v. Ecolab,* No. CV-11-9386 FMO (JCx), a class action litigated by the same Class Counsel involving Ecolab pest elimination specialists, which could have significantly impacted this case.  There was real risk that a decision against Plaintiffs on the parties' cross-motions for summary judgment in *Ladore* could have doomed Plaintiffs' overtime claims in this case.  Instead, as mentioned, Judge Feess repudiated Ecolab's claim that its pest control workers were subject to the "haz/mat" exemption, one of the same exemptions asserted by Ecolab here.

50.     Also pending during the litigation of this case was *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011), which decision Ecolab relied on extensively to support its argument for decertification of the class, asserting that *Wal-Mart* "changed the legal landscape with respect to class certification in misclassification cases." (Dock. 79-1, pg. 26).  Throughout the litigation, the parties disagreed substantially on whether class certification was proper given the disparity between the damages of individual class members and in light of *Dukes.* The California Supreme Court's decision in *Duran v. U.S. Bank Nat. Assn.,* 59 Cal.4th 1 (2014) also caused uncertainty as to whether Plaintiffs could maintain class certification.  Ecolab relied on *Duran* to argue for decertification. (Dock. 79-1, pg. 29).

51.     The litigation also involved a meal break claim.  The California Supreme Court was reviewing the standards applicable to recovery of rest and meal period premiums during the pendency of this case. *See Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004 (2012). Indeed, Plaintiffs' motion to certify the class was continued at Ecolab's request to await the *Brinker* decision being published.  There was a significant risk that the *Brinker* decision could have spelled the end to Plaintiffs' meal break claims.

52.     Here, challenging as it was to maintain the meal break claim after *Brinker* was published,

through our diligent efforts in sifting through thousands of pages of documents for evidence regarding meal breaks and pouring through testimony to rebut Ecolab's argument, Plaintiffs were able to prevail at least in part on their meal break claim, for the period of December 2005 to October 2008.

53.     The parties fiercely disputed whether Ecolab properly classified the Class Members as exempt from California overtime pay pursuant to one or more of three claimed exemptions– namely, the outside sales exemption, commission exemption and the motor carrier/"haz-mat" exemption.  Had the exemptions been found applicable to this case, there was a real risk that the class would not have recovered anything.  Instead, through Class Counsel's efforts and expertise, Plaintiffs were able to prevail on their class certification motion, survive two motions for decertification, survive three motions for summary judgment on Ecolab's asserted exemptions, and prevail on their own summary adjudication motions related to the three asserted exemptions.

## THE CASE PRESENTED NOVEL AND COMPLEX ISSUES

54.     This action involved specialized and highly contested legal issues that are at the cutting edge of recent developments in the law, i.e., whether the claims for overtime compensation were barred based on the three asserted exemptions.  Subsumed within the commissioned sales exemption issue was a sub-issue of which IWC Wage Order applied to class members, since the commissioned sales exemption appears in only two of the Wage Orders. This Court noted the "ambiguity in the application of the outside salesperson exemption." (Dock. No. 104, pg. 7). The Court also noted that the parties' dispute as to the commissioned sales exemption could be traced to "an ambiguity in the law . . ." (Dock. 104, pg. 12).  Resolution of the issues involved researching and analyzing conflicting court opinions and comparing and contrasting the facts of this case to those of recent cases.

55.     Ecolab required expert assistance in its decertification and summary judgment briefing with respect to the outside salesperson exemption, which "expert" (Donald Winter) Class Counsel examined in three separate depositions.  We examined several of Ecolab's corporate witnesses in regard to the outside sales exemption and commissioned sales exemption, such as the duties and responsibilities

19

of RSMs, the percentage of time spent by RSMs in their various duties, how sales commissions were earned, including commissions earned by RSMs on machine rental fees, the contents of commission statements, and the contents of all written lease agreements, among other things. In all, Class Counsel deposed seven Ecolab corporate witnesses, one of them twice.

56.     The litigation also involved particularly specialized skills from me and my co-counsel in analyzing the "haz-mat" exemption asserted by Ecolab. The scant published cases that dealt with the California motor carrier exemption focused on issues distinct from those raised in this case; indeed, the issues presented here are completely novel. Because of the vacuum of authority relating to the application of this exemption to workers who were hired for positions other than driver (here, dishware service technicians), we undertook in-depth research into the legislative history of both the California motor carrier exemption and the federal Motor Carrier Act exemption and all associated regulations and statutes, expending a significant amount of time and incurring appreciable fees. We also spent a significant amount of time reviewing material safety data sheets related to the products, such as detergents and rinses, that were sometimes transported on class members' service vehicles and comparing them to the Hazardous Materials Table and to the Materials of Trade exception to the transportation of hazardous materials found in both federal and state regulations.

57.     Reflecting the complexity of this issue is the fact that Ecolab required the assistance of three experts for its decertification and summary judgment briefing with respect to the motor carrier exemption, who purported to explain to the Court hours of service regulations (Robert Jones); U.S. Department of Transportation Hazardous Materials Regulations (Frits Wybenga and Michelle Gardner); the Materials of Trade exception to transporting hazardous materials (Michelle Gardner); and Material Safety Data Sheets information (Michelle Gardner). Class Counsel examined Ecolab corporate witnesses Ms. Gardner and Greg Suggar in depth regarding the materials transported by class members and examined Ecolab corporate witness Troy Sharratt with regard to Ecolab's policies regarding hours of service regulation training.

## CLASS COUNSEL'S SIGNIFICANT OUT-OF-POCKET EXPENSES

58.     Both my firm and my co-counsel's firm incurred significant expenses in litigating this case. These substantial costs were not reimbursed by Plaintiffs.

59.     My firm incurred $49,859.55 in costs. The Strauss & Palay firm incurred $23,518.31 in total costs, for a combined total of $73,377.86. See Hefelfinger Decl., Ex. 3. Deposition costs were significant, as Ecolab decided to take over 23 depositions, all of which my co-counsel and I had to defend, many of which required extensive travel throughout the state of California. We additionally took nine corporate witness depositions, many of them requiring videoconferencing costs, as most of the corporate deponents were located in Minnesota. We also took three depositions of Ecolab's expert Donald Winter and depositions of three Ecolab declarants in Burbank and San Francisco. The total amount of deposition costs paid by the Hathaway firm is $31,613.97. Mediation expenses were also significant, as the parties participated in three separate mediation sessions. Expert fees in this matter totaled $3,750.00 for the retained services of Drogin, Kakig & Associates, of which the Hathaway firm paid $1,875.00. Other costs included court reporter fees, Court Call fees, Pacer fees, filing fees, attorney service costs, postage costs, FedEx costs, and travel costs, summarized in the table below.

| Expense Type – Hathaway firm | Cost |
| --- | --- |
| Deposition costs | $31,613.97 |
| Pacer costs | 1,326.42 |
| Court Call costs | 299.00 |
| Court Reporter costs | 2,545.25 |
| Filing fees | 80.00 |
| Attorney Service costs | 1,472.00 |
| Postage expense | 485.36 |
| Expert fees | 1,875.00 |
| Federal Express costs | 461.22 |
| Mediator | 3,375.00 |
| Travel costs | 6,326.33 |
| **Total** | **$49,859.55** |

60.     Neither of the two firms have received any reimbursement for any of the monies

DECLARATION OF ALEJANDRO P. GUTIERREZ IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEY FEES – C 13-05097 PJH

expended to cover costs incurred, and advanced all of these costs on a wholly contingency basis. Attached as Exhibit B are schedules of the costs expended by the Hathaway firm.

## BACKGROUND AND EXPERIENCE OF HATHAWAY
## LAW FIRM ATTORNEYS

61.    I am a shareholder of the law firm of Hathaway, Perrett, Webster, Powers, Chrisman & Gutierrez, APC.  I am a graduate of University of California at Davis Law School and was admitted to the California Bar in 1983.

62.    I have extensive experience in civil litigation and an over 30-year history of aggressive, successful prosecution of labor law cases. For instance, in a wage and hour class action, in binding arbitration, I succeeded in procuring an award of $51.2 million for the class.  This recovery represented close to 100% of the compensatory damages suffered by class members, an exceptional and rare result. In fact, my efforts resulted in the largest per-person award in California history. Further, I have successfully resolved several class actions before trial in favor of the class, including *Avitia v. Big Lots Stores*, Los Angeles County Superior Court Case No. BC436317;  *McNeal v. Pacific Satellite*, Los Angeles County Superior Court Case No. BC382775;  *Beltran v. Restaurant Miramar*, Ventura Co. Superior Court Case No. 56-2009-00362572-CU-BC-VTA;  *Dockstader v. Employee Leasing, Inc.* Ventura Co. Superior Court Case No. 56-2010-00371075-CU-OE-VTA; *Roe v. Ecolab*, Ventura Co. Superior Court Case No. CIV 233936; *Dietz v. Ecolab,* Ventura Co. Superior Court Case No. CIV 241827; *Ladore v. Ecolab*, USDC Case No. 11-9386;  *Britto v. Zep*, Alameda County Superior Court Case No. VG-10553718; *Aguiar v. Zep*, USDC Case No. 13-0563; *Rizk v. DirectSat*, Los Angeles County Superior Court Case No. BC363435; *Martino v. Ecolab*, USDC Case No. 14-4358, and *Savannah v. Sodexo*, USDC Case No. 15-5845.

63.    I have worked closely on this case for over six years, beginning in December, 2009. Since that time, I have participated in all phases of the litigation, including researching the claims, analyzing the law, briefing and arguing motions on the pleadings, organizing discovery, taking and

defending multiple depositions, including deposing Ecolab's expert and Ecolab's persons most qualified on a range of topics; developing expert testimony, briefing and arguing Plaintiffs' motions for summary judgment, briefing the opposition to Ecolab's appeal of the Court's order granting summary judgment in favor of Plaintiffs, participating in settlement discussions, including preparing the mediation brief for and participating in the last and successful mediation. The Settlement Agreement was the result of hard fought and lengthy negotiations between Plaintiffs and Ecolab.

64.     I have a keen understanding of the factual and legal issues involved in this case, as well as the relative strengths and weaknesses of Plaintiffs' claims. After careful and extensive review and analysis of the legal and factual issues and the evidence gathered in this case, I believe that the Settlement Agreement is fair, adequate, and reasonable and in the best interests of the Class members.

65.     Adam Acevedo is an associate attorney at the Hathaway firm who worked under my supervision on this case. I assigned to Mr. Acevedo document review and indexing of the multitude of documents produced by Ecolab in this matter. Mr. Acevedo spent many hours looking through the records produced by Ecolab and indexing the same in order for us to map out the actual work performed by Ecolab's Route Managers. Mr. Acevedo also assisted in drafting deposition notices for Ecolab's persons most knowledgeable. Mr. Acevedo received a Master of Business Administration degree from California Lutheran University in 2005. He graduated from Drake University Law School in December 2007 and was admitted to the California Bar in June 2008. Mr. Acevedo has been a civil litigator since 2008 and devotes his time to employment litigation. My firm currently charges an hourly rate of $400 for Mr. Acevedo.

66.     Coleen De Leon is a certified paralegal who worked under my supervision in this case. Ms. De Leon's duties involved taking a large share of all legal research and writing. She was involved in every aspect of the case from its inception, from preparing discovery questions, responding to discovery, drafting motions and other briefs, responding to motions filed by Ecolab, drafting mediation briefs and preparing mediation binders, drafting appellate responsive briefs, summarizing depositions,

preparing summaries of billing records and categorizing tasks for the instant motion, among other substantive tasks. Ms. De Leon received her degree in French at the Collège International de Cannes in France. She went on to earn her paralegal certification in 2002 after attending the Legal Assistantship Program at the University of California at Santa Barbara. She has over 25 years of experience in civil litigation and specializes in wage and hour class actions. My firm charges $195 an hour for Ms. De Leon's time.

67.    Debra Acevedo is also a certified paralegal who worked under my supervision in this case. Ms. Acevedo assisted in this case by reviewing thousands of pages of sales records and commission statement details for selected Ecolab Route Sales Managers in order to calculate the actual direct sales and indirect sales made on accounts. Ms. Acevedo has been in the legal field since 1982 and received her certification after attending the Legal Assistantship Program at the University of California at Santa Barbara. My firm charges $195 an hour for Ms. Acevedo's time.

68.    Associate attorneys Geoffrey Farwell, Seth Shapiro, and Alexis Ridenour also performed work on this case. Mr. Farewell spent 11.6 hours on legal research on the case, Mr. Shapiro spent 13.8 hours on discovery matters, and Ms. Ridenour spent 1.2 hours working on a motion to strike. I have written off all of their time.

## HATHAWAY LAW FIRM ATTORNEYS' FEES

69.    This matter has required the Hathaway firm to spend time on this litigation that could have been spent on other matters. At various times during the litigation of this class action, this lawsuit has consumed my time, along with the time of various associate attorneys and certified paralegals over the years. Such time could otherwise have been spent on other fee-generating work.

70.    The specific work performed by my firm is categorized in Exhibit C. Among other things, my firm coordinated work between the two firms, served as the point of contact and communication with Ecolab's counsel; drafted and responded to written discovery, coordinated document review and reviewed documents, spoke with class members and drafted declarations, took

24

depositions of Ecolab's corporate designees with respect to various different categories of issues, took depositions of Ecolab declarants, defended class member depositions, including the named Plaintiffs' depositions, coordinated the work of Plaintiffs' expert statistician, researched and drafted legal arguments for class certification, dispositive motions and other briefs; revised and edited all briefs submitted in this matter; prepared for and argued the class certification motion and dispositive motions; negotiated settlement terms with Ecolab and preparing settlement documents; drafting supporting documents and arguing the motion for preliminary approval; and drafting the application for attorneys' fees and costs and supporting documents.  We worked as much as was necessary to fully protect the interests of a class facing a determined opposition with great resources.  Much of the work performed was required because of tactics by Ecolab that made the litigation more complex and time-consuming, as discussed *infra*.

71.     The regular practice at the Hathaway firm is for all attorneys and certified paralegals to keep contemporaneous time records, maintained on a daily basis, and describing tasks performed in 0.1 hour increments.  Our firm makes use of timekeeping software called Legal Master.

72.     The current rates for the Hathaway firm's timekeepers is set forth in the table below.

| Timekeeper | Years of Experience | Hourly Rate |
|---|---|---|
| Alejandro P. Gutierrez, Partner | 33 years | $800.00 |
| Adam Acevedo, Associate Attorney | 8 years | $400.00 |
| Coleen De Leon, Certified Paralegal (CP) | 25+ years | $195.00 |
| Debra Acevedo, CP | 25+ years | $195.00 |

These rates are my firm's current commercial billing rates and are supported by our extensive and specialized experience in class wage and hour cases and recognized expertise.  These are the rates that are paid by our commercial, non-contingency fee clients.

73.     I have participated in cases in which I was awarded attorneys' fees at an hourly rate of

$700. For example, in *Aguiar et al. v. Zep et al.*, USDC Case No. 13-cv-99563-WHO, another wage and hour case, the court found in its August 2014 order granting plaintiffs' attorneys' fees that my then-current rate of $700.00 was a reasonable rate. (WL 4063144 (N.D.Cal. Aug. 15, 2014)).

74.    I have personal knowledge of the hourly rates charged by other attorneys with comparable experience to mine in the San Francisco market. Based on that information, I believe that the Hathaway firm's hourly rates are fully consistent with market rates in the Northern District for attorneys with comparable experience, expertise, and qualifications. See, e.g.:

- *Vasquez v. USM Inc.*, No. 13-5449-JD, WL612906, *3 (N.D.Cal., Feb 16, 2016), a wage and hour class action, where the court in granting final approval of a class action settlement and attorney's fees found that the fee requested, although representing more than 50% of the total cash settlement, was adequately supported by counsel's lodestar, which was calculated using hourly fees of $725 for the lead attorney and up to $840 for a senior partner (13:5449, Docket 139-1);

- *Moore v. PetSmart, Inc.*, No. 12-3577 EJD, WL5439000, *12 (N.D.Cal. Aug. 4, 2015), a wage and hour class action in which the court in granting in part final approval of the motion for attorneys' fees stated that, "In this case, the relevant community is the Northern District of California where reasonable rates for partners range from $450 to $800, associates range from $285 to $510, and paralegals and litigation support staff range from $150 to $240" (*Id.*);

- *Holloway et al. v. Best Buy Co., Inc.*, No. 05-5056 PJH (N.D.Cal. Nov. 9, 2011), a class action alleging employment discrimination, in which this court approved a lodestar award based upon rates of up to $825 per hour;

- *Californians for Disability Rights v. California Dept. of Transp.*, WL 8746910 (N.D. Dec 13, 2010), a class action alleging violations of the ADA, in which the court found hourly rates of up to $835 were reasonable for a 49-year attorney, $730 for a 25-year attorney, and $265 for senior paralegals.

26

- *Savaglio, et al. v, WalMart*, Alameda County Superior Court No. C-835687, Order Granting Class Counsel's Motion for Attorneys' Fees, filed September 10, 2010, involving a wage and hour class action in which the court found reasonable, before applying a 2.36 multiplier, rates of up to $875 per hour for a 51-year attorney, $750 for a 39-year attorney, and $775 for a 33-year attorney;

- *Taylor et al. v. West Marine Products, Inc.*, 13-4916 WHA, WL 2452902, *2 (N.D.Cal. 2015), a wage-and-hour class action in which the court in granting a motion for attorney's fees, found the rate of $790 to be reasonable for a 41-year attorney and $625 to be reasonable for 12-year attorneys;

- *Loretz v. Regal Stone, Ltd.*, 756 F.Supp.2d 1203, 1211 (N.D. Cal. 2010), a class action brought in part under California's UCL, in which the court found that the hourly rates of $775 to $900 for partners and $225 for a legal assistant were reasonable;

- *Sarinana v. DS Waters of America, Inc.*, No. 13-0905 EMC (N.D. Cal. 2015), a wage-and-hour class action where the court approved 33 percent of the fund attorney fees with lodestar hourly rates of $750 for a 23-year attorney (ECF No. 134; 2015 WL3820274 (N.D.Cal. 2015);

- *Alexx, Inc. v. Charm Zone, Inc.*, 2011 WL 249471, *2 (N.D. Cal. 2011) (approving as reasonable Jones Day "hourly rate charged (ranging from $400 to $800)" the reasonableness of which was not even contested).

Further, in the *Ladore v. Ecolab* wage-and-hour class action in which I was co-Class Counsel, the U.S. District Court, Central District granted the plaintiffs' motion for attorney's fees, where I had billed at my then-current rate of $700 per hour for my time. The *Ladore* court found that the result that I and my co-counsel achieved was an exceptional result. (Order Re: Final Approval of Class Action Settlement; 11-9386, Doc. 112.)

75.     The contemporaneously maintained logs of time expended by the Hathaway firm

indicate a total of 4,143.65 hours expended litigating this matter. Attached hereto as Exhibit C is a true and correct summary by individual of the hours, billing rate, and lodestar for that particular person's work on this matter through August 5, 2016. The Hathaway firm's total lodestar on the 4,143.65 hours expended through August 5, 2016 amounts to $2,121,082.25. The time the Hathaway firm spent on this case has been completely contingent on the outcome of this action. Our firm has not been paid for any of the time spent on the action.

76.    I and my staff at Hathaway spent considerably more time on this case than is reflected in the time compilation set forth as Exhibit C, but I reduced our actual time in the exercise of billing judgment. For example, I wrote off time for any newly assigned attorneys' review of background materials and getting up to speed on the case as well as for any timekeepers who billed fewer than 20 hours of time on the case. I also delegated many tasks to lower-billing paralegals and associate attorneys.

77.    I expect that the Hathaway firm will spend more time on this case in the future. The current fee application only includes time through August 5, 2016, and does not include all time spent preparing for and filing this application and preparing for and attending the final approval hearing. These activities will likely include communicating with class members who contact us regarding the court's approval of the settlement. Even after this settlement is finally approved, we are likely to continue work on this case without compensation by communicating with class members about Ecolab's compliance with the terms of the Settlement.

78.    I instructed my paralegal to obtain the most current Laffey Matrix online. Attached hereto as Exhibit D and incorporated herein by reference is a true and correct copy of the Laffey Matrix for 2016.

79.    Attached hereto Exhibit E and incorporated herein by reference is a true and correct copy of the locality pay rate for the San Jose-San Francisco-Oakland area effective January 2015, which my staff obtained online.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    I declare under penalty of perjury and under the laws of the United States of America that the

foregoing is true and correct.  Executed this 15th day of August, 2016, at Ventura, California

_____

Alejandro P. Gutierrez

**DECLARATION OF ALEJANDRO P. GUTIERREZ IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEY FEES – C 13-05097 PJH**

Exhibit A

**From:** Millechek, Colleen [mailto:Colleen.Millechek@ecolab.com] **On Behalf Of** Scarsella, Dave
**Sent:** Monday, April 11, 2016 4:31 PM
**Subject:** California Institutional RSM & PureForce SSRM Update
**Importance:** High


April 11, 2016

TO ALL ECOLAB INSTITUTIONAL ROUTE SALES MANAGERS AND
PUREFORCE SALES SERVICE ROUTE MANAGERS IN CALIFORNIA

Ecolab reached a tentative settlement in a California court case regarding how a
limited class of Institutional Route Sales Managers (RSMs) and Pureforce Sales
and Service Route Managers (SSRMs) have been paid in California. Historically,
we have compensated California-based associates on a salary-plus-
commission-plus bonus basis, which is consistent with the compensation model
for our associates in other states. This compensation plan was designed to
reward our RSMs and SSRMs for their efficiency and sales accomplishments,
and to enable greater flexibility and independence. We believed this was
appropriate in California, and consistent with California state law.

However, a California federal court judge recently ruled, that RSMs and SSRMs
in California who are in the class are overtime eligible, under California state
law. We reviewed the judge's decision carefully and continue to believe that we
correctly followed the law in how we paid our associates in California. However,
we decided not to appeal the judge's ruling, so that we could continue focusing
on serving our customers and associates, and invest in our business, rather than
spend time and money to continue litigation.

Under the terms of the agreement, which still needs to be approved by a court,
we have denied any wrongdoing or legal violation with regard to paying our
California RSMs and SSRMs on a salary-plus-commission basis. We have
decided, however, to change our compensation model so that Institutional RSMs
and Pureforce SSRMs in California will be eligible for overtime. This means that
RSMs and SSRMs will need to be converted from salaried-plus-commission-
plus-bonus to hourly employees.  These changes to the compensation model in
California will require changes to how the work day is managed for our

California-based RSMs and SSRMs, and include a requirement that they track the beginning and ending of each work period and all of their hours worked on a daily basis. We are working diligently to develop the new compensation plan (different from our current salary-plus-commission-plus-bonus plan) and we will provide you with further details as they become available.   In the coming months, we will circulate new policies and work rules to our associates in California. We also will schedule training sessions for all RSMs and SSRMs and managers to ensure that our new policies and work rules are understood and followed.

This court decision is based on California state law, and the revised compensation model will only apply to California RSMs and SSRMs. The compensation model will not change for our associates outside of California, who will continue to be compensated on a salary-plus-commission-plus-bonus basis which rewards performance. A federal court judge in another state recently approved our current compensation model for RSMs and SSRMs.

Our associates are critical to the success of our business and the success of our customers. As we work to implement these new work rules and policies, we ask that you continue to focus on delivering the exceptional service our customers expect from Ecolab.

Please direct questions to your District Manager or Area Manager, they will consult with Legal and Human Resources as necessary. Thank you for your continued commitment to our customers and our team.

Sincerely,


Dave Scarsella
Sr. Vice President, Institutional Field Sales


CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain proprietary and privileged information for the use of the designated recipients named above. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

Exhibit B

# ROSS v. ECOLAB

## SUMMARY OF COSTS

### Hathaway Firm

| Category of Cost | Amount |
|---|---:|
|  |  |
| Deposition costs | $31,613.97 |
| Pacer costs | 1,326.42 |
| Court Call costs | 299.00 |
| Court Reporter costs | 2,545.25 |
| Filing fees | 80.00 |
| Attorney Service costs | 1,472.00 |
| Postage expense | 485.36 |
| Expert fees | 1,875.00 |
| Federal Express costs | 461.22 |
| Mediator – Hunter ADR | 3,375.00 |
| Travel costs | 6,326.33 |
| **Total** | **$49,859.55** |

# TRAVEL COSTS
## Hathaway Firm

| Date | Air fare | Amount |
|------|----------|--------|
| | | |
| 5/25/15 | Hearing on motion for class certification San Francisco | 306.80 |
| 4/23/13 | Hearing on cross-motions for summary judgment San Francisco | 406.80 |
| 6/6/13 | Hearing on motion for summary judgment San Francisco | 198.90 |
| 8/20/13 | Hearing on motion to decertify, judgment on the pleadings, motion to substitute representative San Francisco | 445.80 |
| 9/26/13 | Hearing on dispositive motions San Francisco | 413.80 |
| 8/8/14 | Attend mediation JAMS San Francisco | 267.20 |
| 9/4/14 | Case management conference federal court Oakland | 429.20 |
| 5/20/15 | Hearing on summary judgment motions federal court Oakland | 458.10 |
| 5/11/16 | Hearing on preliminary approval of class settlement Oakland | 135.96 |
| | | **$3,062.56** |
| | **Hotels** | |
| | | |
| 4/22/13 | Hearing on cross-motions for summary judgment San Francisco | 228.66 |
| 8/19/13 | Hearing on motion to decertify, judgment on the pleadings, motion to substitute representative | 379.35 |
| 9/25/13 | Hearing on dispositive motions San Francisco | 597.41 |
| 11/17/14 | Depositions of Gerard Kentie and Andrew Beattie | 276.39 |
| 5/19/15 | Hearing on summary judgment motions Oakland | 521.96 |
| | | **$2,003.77** |
| | | |
| | **Taxi fares** | |
| | Round-trip fare $100 - $105, nine fares | **$900.00** |
| | | |
| | **Parking** | **$360.00** |
| | | |
| | **Total Travel Costs** | **$6,326.33** |

# DEPOSITION COSTS
## Hathaway firm

| Inv. Date | Cost | Amount |
|---|---|---|
| 11/15/10 | Merrill Corporation<br>Videoconference Braun and Kerr depos | 900.00 |
| 11/17/10 | Benchmark Reporting Agency, Inc.<br>Deposition of Elizabeth Braun - video<br>Deposition of Jennifer Kerr - video | 985.00 |
| 12/21/10 | Benchmark Reporting<br>Deposition of Elizabeth Braun – transcript<br>Deposition of Jennifer Kerr - transcript | 1,613.45 |
| 1/13/11 | Merrill Corporation<br>Deposition of Gregory John Suggar | 1,568.85 |
| 1/19/11 | Merrill Corporation<br>Deposition of Greg Suggar  - video | 1,180.00 |
| 5/16/11 | Merrill Corporation<br>Deposition of David Bernhard (30(b)(6) | 731.75 |
| 4/17/12 | Peterson Reporting<br>Deposition transcripts Eric Cole, McSweeney | 219.00 |
| 5/8/12 | Peterson Reporting<br>Deposition of Chris McSweeney | 348.88 |
| 5/8/12 | Peterson Reporting<br>Deposition of Eric Cole | 308.54 |
| 7/19/12 | Merrill Corporation<br>Deposition of Enrique Callejas | 450.00 |
| 8/1/12 | Merrill Corporation<br>Deposition of Donald James Winter | 2,278.10 |
| 7/31/12 | Merrill Corporation<br>Deposition of Donald Winter, video conferencing | 1,102.50 |
| 3/28/13 | Merrill Corporation<br>Deposition of Jennifer Kerr, PMK | 1,397.75 |
| 3/29/13 | Merrill Corporation<br>Deposition of  Jennifer Kerr, PMK – videoconference | 1,225.00 |
| 4/2/13 | Merrill Corporation<br>Deposition of Donald Winter – videoconference | 1,876.00 |
| 4/10/13 | Merrill Corporation<br>Deposition of Donald Winter – videoconference | 1,496.25 |
| 4/10/13 | Merrill Corporation<br>Deposition of Donald Winter, Vol. 3 | 2,387.15 |
| 4/10/13 | Merrill Corporation<br>Deposition of Donald Winter, Vol. 2 | 2,561.00 |
| 6/3/13 | Merrill Corporation<br>Deposition of Ecolab PMK cancellation fee | 530.00 |
| 6/7/13 | Merrill Corporation<br>Appearance fee (Ecolab canceled deposition) | 182.75 |

# DEPOSITION COSTS
## Hathaway firm

| 6/7/13 | Merrill Corporation<br>    Appearance fee (Ecolab canceled deposition) | 182.75 |
|---|---|---|
| 11/30/14 | Veritext Legal Solutions<br>    Depositions of Beattie and Kentie | 1,709.25 |
| 12/08/14 | Veritext Legal Solutions<br>    Deposition of Felipe C. Gutierrez, Jr. | 1,282.95 |
| 12/31/14 | Veritext Legal Solutions<br>    Deposition of Kentie, Vol. 2 and Ralph Atkins | 1,620.05 |
| 12/31/14 | Merrill Corporation<br>    Cancellation fee – video (Ecolab canceled) | 250.00 |
| 12/31/14 | Merrill Corporation<br>    Deposition of Ecolab 30(b)(6) witness cancellation | 700.00 |
| 1/29/15 | Merrill Corporation<br>    Deposition of Troy Sharratt (30(b)(6) witness)<br>    Deposition of Doug Moechnig (30(b)(6) witness) | 1,777.00 |
| 1/28/15 | Merrill Corporation<br>    Deposition Troy Sharratt – video conference | 750.00 |
| **Total** | | **$31,613.97** |

# ATTORNEY SERVICE COSTS
## Hathaway Firm

| Inv Date | Cost | Amount |
|----------|------|--------|
| 11/07/12 | Janney & Janney Attorney Service<br>Rush Fax filing fee Case Management Statement | 95.00 |
| 2/14/13 | Attorney's Diversified Services<br>Obtain Order dated June 11, 2012 and e-mail to client | 25.00 |
| 4/11/13 | Janney & Janney Attorney Service<br>Rush filing Opposition to Defendant's MSJ and supporting documents | 65.00 |
| 4/23/13 | Janney & Janney Attorney Service<br>Rush filing Plaintiff's Opposition to Motion for Summary Judgment of Class Claims | 185.00 |
| 4/24/13 | Janney & Janney Attorney Service<br>Next day filing Plaintiff's Notice of Errata | 65.00 |
| 5/3/13 | Janney & Janney Attorney Service<br>Rush filing Plaintiff's Ex Parte Application | 161.00 |
| 5/9/13 | Janney & Janney Attorney Service<br>File Plaintiff's Notice of Errata in Plaintiffs' Opposition to Ecolab MSJ | 65.00 |
| 6/4/13 | Janney & Janney Attorney Service<br>Rush filing Plaintiffs' Reply in Support of Trial Management Plan; evidentiary objections to Declaration Of Frishberg | 156.00 |
| 8/20/13 | Janney & Janney Attorney Service<br>Rush filing Reply in support of Order Substituting Class Reps; Declaration of APG in support | 122.00 |
| 8/20/13 | Janney & Janney Attorney Service<br>Rush filing Plaintiffs' Evidentiary Objections to Exhibits Filed by Ecolab in support of Ecolab's opposition to Motion for order substituting class reps | 93.00 |
| 11/21/14 | Janney & Janney Attorney Service<br>Service of Process Plaintiff Matthew Ross' Request for Production of documents, set five; requests for admission Set Seven | 100.00 |
| 12/9/14 | Janney & Janney Attorney Service<br>Service of Process Plaintiffs' Amended FRCP 30(b)(6) Notice of Deposition of PMK | 100.00 |
| 12/18/14 | Commercial Process Serving, Inc.<br>Service of Process Plaintiffs' Third Amended FRCP 30(b)(6) Notice of Deposition of PMK | 120.00 |
| 12/29/14 | Commercial Process Serving, Inc.<br>Service of Process Plaintiffs' Fourth Amended FRCP 30(b)(6) Notice of Deposition of PMK | 120.00 |
| Total | | **$1,472.00** |

# FEDERAL EXPRESS COSTS
## Hathaway Firm

| Inv. Date | Cost | Amount |
|-----------|------|-------:|
| 6/2/14 | Fed Ex #4813 | 24.14 |
| 6/2/14 | Fed Ex #8875 | 24.14 |
| 6/9/14 | Fed Ex #9206 | 34.49 |
| 7/31/14 | Fed Ex #5426 | 24.14 |
| 10/10/14 | Fed Ex # 9518 | 24.03 |
| 1/7/15 | Fed Ex #6684 | 20.80 |
| 1/8/15 | Fed Ex # 8915 | 27.48 |
| 3/2/15 | Fed Ex #7470 | 88.29 |
| 3/17/15 | Fed Ex #5320 | 24.11 |
| 4/8/15 | Fed Ex #5979 | 45.95 |
| 5/1/15 | Fed Ex #2897 | 28.72 |
| 5/1/15 | Fed Ex #3183 | 24.58 |
| 5/1/15 | Fed Ex #6666 | 28.72 |
| 11/2/15 | Fed Ex #5019 | 34.64 |
| 11/11/15 | Fed Ex #7423 | 31.13 |
| **Total** | | **$485.36** |

# FILING FEE COSTS
## Hathaway Firm

| Date | Cost | Amount |
|------|------|--------|
| 5/10/12 | Filing fee Motion to Quash | 40.00 |
| 5/10/12 | Filing fee Motion for Protective Order | 40.00 |
| **Total** | | $80.00 |
| | | |
| | | |

# COURT REPORTER COSTS
## The Hathaway Firm

| Inv. Date | Cost | Amount |
|---|---|---|
| 6/15/12 | Mary Ann Scanlon, CSR<br>    Hearing on motion for protective order, motion to quash 6/11/12 | 109.00 |
| 4/26/13 | Merrill Corporation<br>    Hearing before Judge Nichols on 4/23/13<br>    Cross-motions summary judgment | 360.25 |
| 6/12/13 | Mary Ann Scanlan, CSR<br>    Hearing before Judge Kramer 6/6/13<br>    Motions for summary judgment | 378.5 |
| 8/23/13 | Mary Ann Scanlan, CSR<br>    Hearing before Judge Kramer, 8/20/13<br>    Motion for decertification of class, motion to substitute class<br>    Representative; motion for judgment on pleadings | 391.25 |
| 10/30/13 | Mary Ann Scanlan, CSR<br>    Hearing on 9/26/13 motion for summary judgment | 706.25 |
| **Total** | | **$2,545.25** |

## PACER COSTS
## Hathaway Firm

| Inv. Date | Cost | Amount |
|---|---|---|
| 4/9/10 | Pacer Research Jan. – March 2010 | 2.16 |
| 7/14/10 | Pacer Research- May – June 2010 | 19.28 |
| 1/18/12 | Pacer Research | 3.28 |
| 7/24/12 | Pacer Research – April – June 2012 | 1.20 |
| 4/19/13 | Pacer Research | 14.20 |
| 7/15/13 | Pacer Research – April – June 2013 | 11.00 |
| 1/23/14 | Pacer Research – Oct. – Dec. 2013 | 13.20 |
| 4/22/14 | Pacer Research – 1/1/14 – 3/31/14 | 64.90 |
| 7/7/14 | Pacer Research – April – June 2014 | 81.30 |
| 10/22/14 | Pacer Research – 7/14 – 9/14 | 50.60 |
| 01/15/15 | Pacer Research – 10/1/14 – 12/31/14 | 21.20 |
| 04/20/15 | Pacer Research – Jan – March 2015 | 470.80 |
| 7/14/15 | Pacer Research – 4/1/ - 6/30/15 | 226.90 |
| 10/27/15 | Pacer Research 7/1/15 to 9/30/15 | 29.20 |
| 1/14/16 | Pacer Research 10/1/15 – 12/31/15 | 77.70 |
| 6/30/16 | Pacer Research 4/1/16 – 6/30/16 | 145.30 |
| **Total** | | **$1,232.22** |

# COURT CALL COSTS
## Hathaway Firm

| Inv. Date | Cost | Amount |
|---|---|---:|
| 10/28/10 | Court call for 9/29/10 | 65.00 |
| 5/21/12 | Court call for 5/10/12 | 78.00 |
| 4/24/13 | Court call for 4/2/13 | 78.00 |
| 5/28/13 | Court call for 4/29/13 | 78.00 |
| **Total** | | **$299.00** |

# Exhibit C

## ROSS v. ECOLAB INC.
## Lodestar Summary
## Hathaway Firm

| Task**see key below | Alejandro P. Gutierrez (Partner) | Adam A. Acevedo (Assoc. Atty) | Coleen De Leon (Certified Paralegal) | Debra D. Acevedo (Certified Paralegal) | Cumulative |
|---|---|---|---|---|---|
| Investigation | 29.5 | | | | 29.50 |
| Written Discovery | 134.5 | | 39.6 | | 174.10 |
| Pleadings | 14.7 | | | | 14.7 |
| Law and Motion (including legal research) | | | | | |
|    Plaintiffs' Motion Protective Order/Quash | 4 | | 37.2 | | 41.20 |
|    Opp Ecolab Motions Protective Order/Sanction | 7.1 | | 13.8 | | 20.90 |
|    Ecolab First Removal | 10.45 | | | | 10.45 |
|    Ecolab Second Removal | 2.55 | | | | 2.55 |
|    Ecolab Third Removal | 1 | | | | 1 |
|    Opp Ecolab First Motion Dismiss | 13.05 | | 35.3 | | 48.35 |
|    Plaintiffs' Motions Remand | 11.4 | | | | 11.40 |
|    Plaintiffs' Motion Sanctions | 1.5 | | | | 1.50 |
|    Opp Ecolab Second Motion Dismiss | 5.1 | | | | 5.10 |
|    Ps' Motion Disclosure Putative Class | 3.45 | | | | 3.45 |
|    Ps' Motion Compel Further Responses | 10.75 | | | | 10.75 |
|    Ecolab Motion Reconsideration | 3.4 | | | | 3.40 |
|    Ps' Motion Summary Adjudication | 114.90 | | | | 114.90 |
|    Ps' Motion for Class Certification | 98.7 | | 9.9 | | 108.60 |
|    Ps' Motion Quash Subpoenas | 2.5 | | | | 2.50 |
|    Opp Ecolab First MSJ | 41.30 | | 44.2 | | 85.50 |
|    Ecolab Motion Complex Designation | 3.10 | | | | 3.10 |
|    Opp Ecolab Second MSJ | 112 | | 156.1 | | 268.10 |
|    Opp Ecolab First Decertification Motion | 40.2 | | | | 40.20 |
|    Opp Ecolab Second Decertification Motion | 15.15 | | | | 15.15 |
|    Ps' Motion Trial Management Plan | 21.6 | | 20.3 | | 41.90 |
|    Ps' Motion Substitution Class Representative | 17.50 | | 17.2 | | 34.70 |
|    Ps' Motion Judgment on Pleadings | 7.60 | | | | 7.60 |
|    Ps' Motion Partial Summary Judgment/Reply | 321.25 | | 520.30 | | 841.55 |
|    Opp Ecolab Cross-Motion SJ | 147.95 | | 185.90 | .75 | 334.60 |

## ROSS v. ECOLAB INC.
## Lodestar Summary
## Hathaway Firm

| Task | Alejandro P. Gutierrez (Partner) | Adam A. Acevedo (Assoc. Atty) | Coleen De Leon (Certified Paralegal) | Debra D. Acevedo (Certified Paralegal) | Cumulative |
|---|---|---|---|---|---|
| Ps' Motion Strike Affirmative Defenses | 6.5 | | 43.3 | | 49.80 |
| Ecolab Motion Extension Time | .40 | | | | .40 |
| Supp Brief Re Meal Periods | 10.40 | | 15.90 | | 26.30 |
| Opp Ecolab Motion Certify for Appeal | 2.90 | | 67.90 | | 70.80 |
| Ecolab Pro Hac Vice Motions | .70 | | | | .70 |
| Case management | 41.55 | | 6.5 | | 48.05 |
| Rule 26 Disclosures | 18.7 | | | | 18.70 |
| Document review/Indexing/analysis | 91.65 | 92.8 | 25.00 | 39.00 | 248.45 |
| Depositions | 409.2 | 3.6 | 109.20 | | 522.00 |
| Power Point Presentation Re Exemptions | 7.5 | | 48.1 | | 55.60 |
| Mediation preparation and attendance | 113.35 | | 80.70 | | 194.05 |
| Post-settlement work | 7.70 | | | | 7.70 |
| Motion Preliminary Approval Settlement | 20.9 | | 3.70 | | 24.60 |
| Motion Final Approval Settlement | 22.80 | | 63.40 | | 86.20 |
| Motion Attorney Fees and Costs | 82.6 | | 270.8 | | 353.40 |
| Motion for Incentive Awards | 7.10 | | 23.1 | | 30.20 |
| Client communications | 73.10 | | 30.70 | | 103.80 |
| Expert research/communications | 9.15 | | | | 9.15 |
| Preliminary trial preparation | 15.30 | | 1.7 | | 17.00 |
| **Total hours:** | **2,137.70** | **96.40** | **1,869.80** | **39.75** | **4,143.65** |
| Rate | X $800 | X $400 | X $195 | X $195 | |
| Lodestar | $1,710,160 | $38,560 | $364,611 | $7,751.25 | $2,121,082.25 |

| |
|---|
| **Key: |
| **Investigation**: This category includes time spent investigating the potential claims of the original plaintiff, James Icard, which occurred prior to the filing of the initial complaint in December 2009. This category also includes work performed to meet with Mr. Icard and initiate the attorney-client relationship.  This category also includes research regarding the route manager position and products carried, reviewing MSDS sheets regarding products carried. |

**ROSS v. ECOLAB INC.**
**Lodestar Summary**
**Hathaway Firm**

| |
|---|
| **Written Discovery**:  This category includes time spent preparing written discovery requests and responses, including legal research re: exemptions asserted by Ecolab, interfacing with co-counsel to strategize the contents of discovery requests and the appropriateness of responses, interfacing with the clients to obtain the information necessary for discovery responses, reviewing Ecolab's discovery responses and assessing for potential motions to compel, and meeting and conferring regarding deficient discovery responses. |
| **Pleadings**:  This category includes time spent preparing the complaint and amended complaints, the filing of the same, and the review of Ecolab's pleadings. |
| **Law and Motion**:  This category includes time spent preparing all levels of law and motion throughout the case, exclusive of those concerning post-Settlement matters.  This category also includes time spent performing necessary legal research for each of the motions, whether they were the initiating motion, the opposition, the reply brief, or evidentiary objections.  This category also includes appearance at the hearings on each motion, and the travel thereto (which was usually round-trip from our office in Ventura to the San Francisco Bay Area). |
| **Case Management**:  This category includes time spent performing case management-related tasks, such as reviewing scheduling orders, standing orders, and local rules, stipulations regarding scheduling orders, meeting with co-counsel and opposing counsel regarding scheduling and case management conferences, preparing joint CMC reports, conferring with counsel regarding ADR issues, reviewing court orders regarding case management, and attending case management conferences. |
| **Disclosures**:  This category includes time spent preparing the initial and supplemental disclosures and Rule 26 joint report. |
| **Document review**:  This category includes time spent reviewing documents produced by Ecolab and various class members concerning this case, as well as the indexing and analysis of the same. |
| **Depositions**:  This category includes time spent drafting deposition notices, drafting objections to deposition notices, deposition scheduling, communications with court reporter and counsel re: deposition schedules, preparing for and attending depositions throughout California, including preparing named plaintiffs and other class members for their depositions, preparing documents for exhibits to depositions of Ecolab corporate witnesses, summarizing deposition transcripts, preparing issue categories from depositions, preparing comparative testimony tables, and reviewing video tapes of depositions. |
| **Mediation**:  This category includes time spent preparing for and attending mediations, such as drafting mediation briefs and mediation binders, calculating damages, engaging in settlement communications, communicating with the neutrals and their administrators, and the round-trip travel to the mediations. |

# ROSS v. ECOLAB INC.
## Lodestar Summary
### Hathaway Firm

| |
|---|
| **Post-settlement work**:  This category includes time spent communicating with class members after the distribution of the Class Notice of settlement, answering their questions about the settlement and their claims, and interfacing with opposing counsel and the claims administrator to ensure compliance with the court's preliminary approval order and the terms of the settlement agreement. |
| **Motion for Preliminary Approval**:  This category includes time spent preparing the motion for preliminary approval of the settlement, the Class Notice, the proposed order, and the Settlement Agreement itself.  It also includes the attendance at the hearing on the motion for preliminary approval and travel to the San Francisco Bay Area. |
| **Motion for Final Approval**:  This category includes time spent preparing the motion for final approval of the settlement and accompanying exhibits and declarations, as well as the proposed order.  It also includes time spent attending the hearing on the motion, which we have to estimate, given that it has not yet occurred. |
| **Motion for Attorneys' Fees and Costs**:  This category includes time spent preparing the motion for attorney's fees and costs and all supporting documents for the motion, including declarations from Bay Area attorneys who support the requested hourly rates of Class Counsel.  This category also includes time spent going through each billing line item for more than six and one-half years of billing for each timekeeper and sorting each task into its category of task as represented in the above table, updating such categories as timekeepers continued performing tasks in this matter, and preparing this summary of tasks.  This category also includes time spent gathering back-up documentation for each cost incurred by Class Counsel, preparing tables of costs for each category of cost, and preparing a summary of those costs. |
| **Motion for Incentive Awards**:  This category includes preparing the motion and four supporting declarations, as well as the proposed order. |
| **Client communications**:  This category includes time spent communicating directly with the named plaintiffs and other class members. |
| **Expert**:  This category includes time spent researching and communicating with potential expert witnesses, time spent communicating with retained expert Dr. Drogin and supplying him with information needed to compile his expert report. |
| **Preliminary trial preparation**:  This category includes time spent preparing for the eventual trial in this matter. |

Exhibit D

# LAFFEY MATRIX

History

Case Law

Expert Opinion

See the Matrix

Contact us

Home

Links

| Year | Adjustmt Factor** | Paralegal/ Law Clerk | Years Out of Law School * | | | | |
|------|------|------|------|------|------|------|------|
| | | | 1-3 | 4-7 | 8-10 | 11-19 | 20 + |
| 6/01/15- 5/31/16 | 1.0089 | $180 | $331 | $406 | $586 | $661 | $796 |
| 6/01/14- 5/31/15 | 1.0235 | $179 | $328 | $402 | $581 | $655 | $789 |
| 6/01/13- 5/31/14 | 1.0244 | $175 | $320 | $393 | $567 | $640 | $771 |
| 6/01/12- 5/31/13 | 1.0258 | $170 | $312 | $383 | $554 | $625 | $753 |
| 6/01/11- 5/31/12 | 1.0352 | $166 | $305 | $374 | $540 | $609 | $734 |
| 6/01/10- 5/31/11 | 1.0337 | $161 | $294 | $361 | $522 | $589 | $709 |
| 6/01/09- 5/31/10 | 1.0220 | $155 | $285 | $349 | $505 | $569 | $686 |
| 6/01/08- 5/31/09 | 1.0399 | $152 | $279 | $342 | $494 | $557 | $671 |
| 6/01/07-5/31/08 | 1.0516 | $146 | $268 | $329 | $475 | $536 | $645 |
| 6/01/06-5/31/07 | 1.0256 | $139 | $255 | $313 | $452 | $509 | $614 |
| 6/1/05-5/31/06 | 1.0427 | $136 | $249 | $305 | $441 | $497 | $598 |
| 6/1/04-5/31/05 | 1.0455 | $130 | $239 | $293 | $423 | $476 | $574 |
| 6/1/03-6/1/04 | 1.0507 | $124 | $228 | $280 | $405 | $456 | $549 |
| 6/1/02-5/31/03 | 1.0727 | $118 | $217 | $267 | $385 | $434 | $522 |
| 6/1/01-5/31/02 | 1.0407 | $110 | $203 | $249 | $359 | $404 | $487 |
| 6/1/00-5/31/01 | 1.0529 | $106 | $195 | $239 | $345 | $388 | $468 |
| 6/1/99-5/31/00 | 1.0491 | $101 | $185 | $227 | $328 | $369 | $444 |
| 6/1/98-5/31/99 | 1.0439 | $96 | $176 | $216 | $312 | $352 | $424 |
| 6/1/97-5/31/98 | 1.0419 | $92 | $169 | $207 | $299 | $337 | $406 |
| 6/1/96-5/31/97 | 1.0396 | $88 | $162 | $198 | $287 | $323 | $389 |
| 6/1/95-5/31/96 | 1.032 | $85 | $155 | $191 | $276 | $311 | $375 |
| 6/1/94-5/31/95 | 1.0237 | $82 | $151 | $185 | $267 | $301 | $363 |

The methodology of calculation and benchmarking for this Updated Laffey Matrix has been approved in a number of cases. See, e.g., McDowell v. District of Columbia, Civ. A. No. 00-594 (RCL), LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001); Salazar v. Dist. of Col., 123 F.Supp.2d 8 (D.D.C. 2000).

\* "Years Out of Law School" is calculated from June 1 of each year, when most law students graduate. "1-3" includes an attorney in his 1st, 2nd and 3rd years of practice, measured from date of graduation (June 1). "4-7" applies to attorneys in their 4th, 5th, 6th and 7th years of practice. An attorney who graduated in May 1996 would be in tier "1-3" from June 1, 1996 until May 31, 1999, would move into tier "4-7" on June 1, 1999, and tier "8-10" on June 1, 2003.

\*\* The Adjustment Factor refers to the nation-wide Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor.

Exhibit E

SALARY TABLE 2015-SF

INCORPORATING THE 1% GENERAL SCHEDULE INCREASE AND A LOCALITY PAYMENT OF 35.15%

FOR THE LOCALITY PAY AREA OF SAN JOSE-SAN FRANCISCO-OAKLAND, CA

TOTAL INCREASE: 1%

EFFECTIVE JANUARY 2015

*Hourly Basic (B) Rates by Grade and Step*
*Hourly Overtime (O) Rates by Grade and Step*

| Grade | B/O | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Step 9 | Step 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | B | $ 11.76 | $ 12.15 | $ 12.54 | $ 12.93 | $ 13.33 | $ 13.55 | $ 13.94 | $ 14.33 | $ 14.35 | $ 14.71 |
|   | O | 17.64 | 18.23 | 18.81 | 19.40 | 20.00 | 20.33 | 20.91 | 21.50 | 21.53 | 22.07 |
| 2 | B | 13.22 | 13.54 | 13.98 | 14.35 | 14.51 | 14.93 | 15.36 | 15.79 | 16.21 | 16.64 |
|   | O | 19.83 | 20.31 | 20.97 | 21.53 | 21.77 | 22.40 | 23.04 | 23.69 | 24.32 | 24.96 |
| 3 | B | 14.43 | 14.91 | 15.39 | 15.87 | 16.35 | 16.83 | 17.31 | 17.80 | 18.28 | 18.76 |
|   | O | 21.65 | 22.37 | 23.09 | 23.81 | 24.53 | 25.25 | 25.97 | 26.70 | 27.42 | 28.14 |
| 4 | B | 16.20 | 16.74 | 17.28 | 17.82 | 18.36 | 18.90 | 19.44 | 19.98 | 20.52 | 21.06 |
|   | O | 24.30 | 25.11 | 25.92 | 26.73 | 27.54 | 28.35 | 29.16 | 29.97 | 30.78 | 31.59 |
| 5 | B | 18.12 | 18.72 | 19.33 | 19.93 | 20.54 | 21.14 | 21.75 | 22.35 | 22.95 | 23.56 |
|   | O | 27.18 | 28.08 | 29.00 | 29.90 | 30.81 | 31.71 | 32.63 | 33.53 | 34.43 | 35.34 |
| 6 | B | 20.20 | 20.87 | 21.55 | 22.22 | 22.89 | 23.57 | 24.24 | 24.91 | 25.59 | 26.26 |
|   | O | 30.30 | 31.31 | 32.33 | 33.33 | 34.34 | 35.36 | 36.36 | 37.37 | 38.39 | 39.39 |
| 7 | B | 22.45 | 23.19 | 23.94 | 24.69 | 25.44 | 26.19 | 26.93 | 27.68 | 28.43 | 29.18 |
|   | O | 33.68 | 34.79 | 35.91 | 37.04 | 38.16 | 39.29 | 40.40 | 41.52 | 42.65 | 43.77 |
| 8 | B | 24.86 | 25.69 | 26.52 | 27.35 | 28.17 | 29.00 | 29.83 | 30.66 | 31.49 | 32.32 |
|   | O | 37.29 | 38.54 | 39.78 | 41.03 | 42.26 | 43.50 | 44.75 | 45.36 | 45.36 | 45.36 |
| 9 | B | 27.46 | 28.37 | 29.29 | 30.20 | 31.12 | 32.03 | 32.95 | 33.86 | 34.78 | 35.69 |
|   | O | 41.19 | 42.56 | 43.94 | 45.30 | 45.36 | 45.36 | 45.36 | 45.36 | 45.36 | 45.36 |
| 10 | B | 30.24 | 31.24 | 32.25 | 33.26 | 34.27 | 35.27 | 36.28 | 37.29 | 38.30 | 39.30 |
|   | O | 45.36 | 45.36 | 45.36 | 45.36 | 45.36 | 45.36 | 45.36 | 45.36 | 45.36 | 45.36 |
| 11 | B | 33.22 | 34.33 | 35.43 | 36.54 | 37.65 | 38.76 | 39.86 | 40.97 | 42.08 | 43.19 |
|   | O | 45.36 | 45.36 | 45.36 | 45.36 | 45.36 | 45.36 | 45.36 | 45.36 | 45.36 | 45.36 |
| 12 | B | 39.82 | 41.14 | 42.47 | 43.80 | 45.13 | 46.45 | 47.78 | 49.11 | 50.44 | 51.77 |
|   | O | 45.36 | 45.36 | 45.36 | 45.36 | 45.36 | 46.45 | 47.78 | 49.11 | 50.44 | 51.77 |
| 13 | B | 47.35 | 48.93 | 50.50 | 52.08 | 53.66 | 55.24 | 56.82 | 58.39 | 59.97 | 61.55 |
|   | O | 47.35 | 48.93 | 50.50 | 52.08 | 53.66 | 55.24 | 56.82 | 58.39 | 59.97 | 61.55 |
| 14 | B | 55.95 | 57.82 | 59.68 | 61.55 | 63.41 | 65.28 | 67.14 | 69.01 | 70.87 | 72.74 |
|   | O | 55.95 | 57.82 | 59.68 | 61.55 | 63.41 | 65.28 | 67.14 | 69.01 | 70.87 | 72.74 |
| 15 | B | 65.81 | 68.01 | 70.20 | 72.40 | 74.59 | 76.04 | 76.04 | 76.04 | 76.04 | 76.04 |
|   | O | 65.81 | 68.01 | 70.20 | 72.40 | 74.59 | 76.04 | 76.04 | 76.04 | 76.04 | 76.04 |

* Rate limited to the rate for level IV of the Executive Schedule (5 U.S.C. 5304 (g)(1)).

Applicable locations are shown on the 2015 Locality Pay Area Definitions page: http://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/2015/locality-pay-area-definitions/